UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE ROOKWOOD CORPORATION, | ) | Case No. 11-12756 |
| | ) | |
| Debtor. | ) | Judge Jeffery P. Hopkins |

## **MOTION OF TINC LLC FOR RELIEF FROM STAY**

TINC LLC ("TINC"), by counsel, requests entry of an Order granting TINC relief from the automatic stay pursuant to 11 U.S.C. § 362(d) with respect to its collateral, to obtain possession of that collateral, and to proceed with the previously-scheduled and fully-marketed public sale of that collateral under Article 9 of the Ohio Uniform Commercial Code. In support of its Motion, TINC states as follows:

### **I. Jurisdiction and Venue**

1. The Court has jurisdiction over this Motion and the matters set forth herein pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a contested matter pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure, and a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. The basis for the relief requested herein is contained in 11 U.S.C. §§ 361, 362, and 1129; Rules 4001, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure; and Local Bankruptcy Rules 4001-1, 6007-1, 9013-1, and 9013-2.

4. The parties who may be affected by the relief requested herein are The Rookwood Corporation; First Bank, a Missouri chartered bank; the Department of Development of the State of Ohio; Ronald Bates; and Martin Wade.

## II. General Background

### A. Rookwood's History

5.  Maria Longworth fired the first piece of Rookwood pottery in November 1880, beginning the first female-owned manufacturing company in the United States. Nine years later, in 1889, Rookwood Pottery of Cincinnati won first place medals at the Exhibition of American Art Industry in Philadelphia, and at L'Exposition Universelle in Paris. Over the next fifty years, Rookwood continued to earn international notoriety and awards as its artists refined the distinctive techniques and processes that came to define Rookwood pottery.

6.  Like many companies, Rookwood suffered during the Great Depression and was forced to file bankruptcy in 1941. Local businessman Walter Scott purchased all of the assets out of bankruptcy, allowing Rookwood's artists and employees to keep their jobs and the company to continue producing Cincinnati pottery. In 1959, Herschede Clock Company purchased Rookwood and moved the business to Starkesville, Mississippi the following year. In 1967, Rookwood sought bankruptcy relief once again and was purchased by Robert Sloan, its lead designer, who began selling Rookwood piece by piece on a commission basis.

7.  Dr. Arthur Townley purchased all of Rookwood's assets in 1982, holding them until 2006 when he sold them to The Rookwood Corporation d/b/a The Rookwood Pottery Company (the "Debtor"), a company formed by a group of investors led by Christopher Rose ("Rose"). In connection with that sale, the Debtor gave Dr. Townley and his wife, Rita, a Promissory Note dated May 12, 2006 (the "Townley Note") in the amount of $1,597,500.00, and executed a Security Agreement dated May 1, 2006 (the "Townley Security Agreement") in favor of the Townleys securing the indebtedness under the Townley Note and granting the Townleys a security interest in substantially all of the Debtor's assets. True and accurate copies of the

Townley Note and the Townley Security Agreement are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively. The Townleys properly perfected their security interest in the Debtor's assets by filing UCC-1 financing statement number 6162769-4 with the Delaware Department of State on May 14, 2006. A true and accurate copy of the Townleys' UCC-1 financing statement is attached hereto as **Exhibit 3**.

8. Under Rose's leadership, the Debtor was unable to operate profitably and it was necessary to bring in new investors and borrow additional money to fund operations. In addition to the Townley obligations and during the course of its operations, the Debtor incurred additional secured debt that, upon information and belief, remains in the following order of priority and perfection after the Townley obligations:

    a. First Bank, reflected by UCC-1 financing statement number 2008-3118716 filed with the Delaware Department of State on September 10, 2008, securing indebtedness in the original principal amount of approximately $1,750,000.00;

    b. Department of Development—State of Ohio, reflected by UCC-1 financing statement number 2010-0067276 filed with the Delaware Department of State on January 8, 2010, securing indebtedness in the original principal amount of approximately $673,500.00;

    c. Ronald Bates, reflected by (i) UCC-1 financing statement number 2011-0320203 filed with the Delaware Department of State on January 27, 2011; and (ii) UCC-1 financing statement number 2011-0712318 filed with the Delaware Department of State on February 25, 2011, securing indebtedness in the original principal amount of approximately $225,000.00; and

    d. Martin Wade, reflected by UCC-1 financing statement number 2011-1221020 filed with the Delaware Department of State on April 1, 2011, securing indebtedness in the original maximum principal amount of approximately $1,500,000.00.

9. In 2007, Martin Wade and his wife, Marilyn, took an interest in the Debtor and the efforts to revive it as a viable Cincinnati icon. To that end, the Wades formed ASTFH LLC and between 2007 and 2008, ASTFH LLC purchased four million shares of the Debtor. At that time,

ASTFH LLC and Rose were the two largest shareholders of the Debtor, each holding approximately four million shares. In 2008, Mr. Wade was elected to the board of directors of the Debtor, and since that time ASTFH LLC has acquired roughly 3.5 million more shares of the Debtor. All of the debt financing described in the preceding paragraph, except for the relatively modest loan from Ronald Bates, was obtained with the assistance of the Wades.

10. In fact, without the Wades' support, the Debtor's operations would have ceased years ago. Neither the First Bank loan, on which Martin and Marilyn Wade are co-obligors, nor the State of Ohio loan, which Mr. Wade personally guaranteed, would have been made without the Wades' personal financial commitments. Indeed, for many months, the Wades have been providing nearly all of the Debtor's operating capital to allow it to pay vital, current obligations such as payroll and utilities.

11. Despite the infusion of additional equity and credit to maintain such basic operational obligations as payroll and utilities, the Debtor's performance and condition continued to deteriorate. Over the last three years, the Debtor experienced negative operating income of ($771,647) in 2008; ($899,503) in 2009; and ($780,117) in 2010; and negative EBITDA of ($753,647) in 2008; ($871,764) in 2009; and ($780,117) in 2010. As a result, it has been unable to meet many of its obligations.

12. Under the Townley Note, the Debtor owed quarterly payments in 2009 of $50,000.00 each, but made only one such payment. In January 2010, the Debtor's obligations under the Townley Note matured with the Debtor in default. With approximately $1,072,500.00 still owing in principal in the fall of 2010 and no payments having been made since November 2009, the Townleys retained counsel in Ohio to file suit against the Debtor and foreclose their properly perfected, first priority security interest. Rose convinced the Townleys not to commence

litigation in return for the promise of a five to ten thousand dollar "good faith" payment to be made by November 22, 2010. Rose reneged on that promise and the Debtor was unable to and never did make that payment.

13. Although the Wades had directly and indirectly helped to finance the Debtor's basic operations for a very long time at great cost to themselves, they still keenly wanted the Debtor to succeed and continue its existence in Cincinnati. To that end, TINC, a company owned by the Wades, began negotiating with the Townleys to purchase the Townley Note and Townley Security Agreement in an effort to stave off litigation and foreclosure. On December 2, 2010, the Townleys and TINC entered into a Note Purchase Assignment and Assumption Agreement (the "TINC Assignment") pursuant to which TINC purchased all right, title, and interest in the Townley Note and the Townley Security Agreement for $300,000.00. A true and accurate copy of the TINC Assignment is attached hereto as **Exhibit 4**. On December 7, 2010, Dr. Townley authorized and TINC filed a UCC-3 amendment with the Delaware Department of State as filing number 2010-4298950 changing the secured party from Dr. Townley to TINC. A true and accurate copy of the UCC-3 amendment is attached hereto as **Exhibit 5**. On March 25, 2011, TINC filed a UCC-3 continuation statement with the Delaware Department of State as filing number 2011-1109118 continuing the security interest perfected by the Townleys in May of 2006. A true and accurate copy of the UCC-3 continuation statement is attached hereto as **Exhibit 6**. As a consequence of the foregoing, the Debtor's senior secured creditors (the Townleys), who were on the verge of foreclosing their lien and effectively ending the Debtor as a business and a brand, were replaced by TINC, which was willing to forebear enforcement of those lien rights and was committed to the preservation and success of the Rookwood business.

14. Unhappy with the Debtor's years of poor performance and Rose's mismanagement, shareholders holding a majority of the Debtor's stock consented to or ratified the removal of Rose as a director of the Debtor effective December 22, 2010. The Board of Directors of the Debtor removed Rose as an officer of the Debtor that same day, an action also ratified by a majority of the Debtor's shareholders.

**B. The Article 9 Sale**

15. Since then, the Debtor's new management, led in part by Mr. Wade, has been working to maintain the company's goodwill and devise a plan by which the business can continue as a going concern in Cincinnati, preserving the iconic Rookwood brand as well as jobs for more than 20 employees—some of them highly skilled artisans—in Cincinnati's Over-the-Rhine neighborhood. During this time, the Wades have provided substantially all of the Debtor's operating capital to allow it to pay vital, current obligations such as payroll and utilities.

16. Management concluded that substantially all of the Debtor's assets should be sold at auction pursuant to Article 9 of the Ohio Uniform Commercial Code. Shareholders holding a majority of the Debtor's stock consented to the Article 9 sale. Rippe & Kingston Capital Advisors was engaged to publically market the company. Rippe & Kingston prepared a Confidential Memorandum regarding the Debtor's business, assets, and financial condition, which was issued on April 15, 2011. TINC issued notices of the Article 9 sale to the Debtor's secured creditors on April 13 and 14, 2011.

17. The auction was originally scheduled to take place on April 27, 2011 but was postponed until May 6, 2011, with Qualified Bid Documents to be submitted by May 4, 2011. Six buyers expressed preliminary interest and received the Confidential Memorandum. After almost

three weeks of marketing, DITR, LLC, an entity formed by the Wades for the purpose of buying Rookwood's assets and rescuing its business, was the only Qualified Bidder as of May 4, 2011.

18. A complete list of the Debtor's assets to be sold at the Article 9 sale (the "Assets") is attached hereto as **Exhibit 7**.

### C. The State Court Action

19. Upset by the decision of the Debtor's shareholders to remove him and in an effort to regain control of the company that he had very nearly destroyed by way of years of mismanagement, Rose, individually and derivatively on behalf of the Debtor, filed a Complaint in the Court of Common Pleas of Hamilton County, Ohio under Case No. A1102061 (the "State Court Action") on March 10, 2011, naming the Wades, TINC, and ASTFH LLC as defendants. In the Complaint, Rose asserted claims for an accounting, breach of fiduciary duty, breach of loyalty, conversion, gross mismanagement, civil conspiracy, and violations of Delaware corporate law. Although Rose purports to be acting derivatively on behalf of the Debtor, in fact most of the claims asserted and relief demanded are personal to him (i.e., he seeks money damages for himself and seeks to be reinstated as Rookwood's president).

20. On March 23, 2011, Rose filed a Motion for Temporary Restraining Order in the State Court Action, seeking to prevent the transfer of the Debtor's assets and requiring the production of certain records. On April 1, 2011, after full briefing and oral argument, the Court of Common Pleas denied Rose's request for a temporary restraining order.

21. On March 30, 2011, Rose filed an Amended Complaint in the State Court Action, naming the Wades, TINC, and ASTFH LLC as defendants and asserting nearly identical claims for an accounting, breach of fiduciary duty, breach of loyalty, conversion, gross mismanagement,

civil conspiracy, and violations of Delaware corporate law. Again, although Rose purports to be acting on behalf of the Debtor, most of the claims asserted are personal to him.

22. On April 21, 2011, Rose filed a second Motion for Temporary Restraining Order and/or Preliminary Injunction to prevent the transfer of the Debtor's assets, specifically, to enjoin the Article 9 sale, essentially repeating all of the legal arguments that had been considered and rejected by the Court of Common Pleas in denying his first TRO motion just a few weeks before.

23. On April 27, 2011, the Defendants filed their Motion to Dismiss the Amended Complaint explaining that, for a variety of reasons, the Amended Complaint is fatally deficient and does not state any claims upon which relief could be granted. On May 3, 2011, the Defendants filed their opposition to Rose's second Motion for Temporary Restraining Order.

### D. The Involuntary Chapter 11 Case

24. The Court of Common Pleas was never given the opportunity to rule on Rose's second motion to prevent the sale of the Debtor's assets, as he and two other creditors filed an involuntary petition against the Debtor commencing this chapter 11 case on May 4, 2011 (the "<u>Commencement Date</u>"). An Order for Relief was entered on May 27, 2011.

25. On the Commencement Date, the value of the Assets was no more than approximately $2,200,000.00. Upon information and belief, the Debtor has no assets other than the Assets listed on Exhibit 7.

26. On the Commencement Date, TINC was owed approximately $1,215,010.00 in principal and interest under the Townley Note, not including attorneys' fees provided for under the note.

27. Upon information and belief, on the Commencement Date, the Debtor had no unencumbered assets and its total secured debt was more than $4.5 million. In addition to its

8

obligations to TINC, the Debtor owed roughly $3,297,000.00 on its other secured obligations, including approximately $1,233,000.00 to First Bank (on which the Wades are co-obligors); approximately $673,000.00 to the Department of Development—State of Ohio (which Martin Wade personally guaranteed); approximately $255,000.00 to Ronald Bates; and approximately $1,136,000.00 to Martin Wade.

28. For these reasons, and as set forth below, cause exists to grant TINC the relief requested herein, including because the Debtor cannot provide TINC with adequate protection of its interest in collateral; because the Debtor does not have equity in the collateral; because such collateral is not necessary to the Debtor's effective reorganization; and because there is a pending state court action where many of these issues, including the merits of the Article 9 sale, have been briefed and are awaiting decision. Accordingly, TINC respectfully requests relief from the automatic stay in order to proceed with the public sale of that collateral under Article 9 of the Ohio Uniform Commercial Code.

### III. Basis for the Relief Requested

**A. The Debtor Cannot Adequately Protect TINC**

29. On the Commencement Date, the automatic stay was triggered under 11 U.S.C. § 362(a). Subsection (d)(1) provides that the Court may grant relief from the automatic stay for "cause," including the lack of adequate protection of an interest in property. TINC has a perfected, first priority security interest in the Assets, which comprise substantially all of the Debtor's property and include cash, personal property, intellectual property, trade fixtures, and accounts receivable.

30. In this case, the Assets are depreciating during the period of the automatic stay. As a general rule, a secured creditor is not adequately protected if its interest in property is

9

depreciating during the automatic stay. In such a situation, the creditor is entitled to cash payments or additional security in the amount of the decline in value. <u>United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.</u>, 484 U.S. 365, 370 (1988). Adequate protection is defined in 11 U.S.C. § 361 to include: (a) the payment of cash or grant of a lien to compensate a secured creditor for the decrease in value of its collateral during the stay; (b) providing the creditor with an additional or replacement lien to the extent its collateral decreases in value during the stay; or (c) granting other relief, such as an administrative expense priority which will grant the creditor the indubitable equivalent of its interest in the collateral.

31. The Debtor, however, has insufficient assets that may be offered to adequately protect TINC. TINC's properly perfected security interest extends not only to the Assets but to all proceeds thereof. At a minimum, the Debtor would be required to offer TINC replacement liens in unencumbered assets, whether cash or other assets, as adequate protection. Because TINC already has a lien on all of the Debtor's assets and their proceeds, however, it is unlikely that the Debtor can adequately protect TINC with a replacement lien. A secured creditor is not adequately protected by an offer of collateral in which it is already perfected, and such an offer is untenable and impermissible. <u>See</u>, <u>e.g.</u>, <u>Nationsbank, N.A. v. LDN Corp. (In re LDN Corp.)</u>, 191 B.R. 320, 324 (Bankr. E.D. Va. 1996).

32. Adequate protection may also be provided by granting TINC an administrative expense in this bankruptcy case. Based on current information, however, the estate will in all likelihood be administratively insolvent and such claims will have no value. Such protection would therefore be insufficient.

33. As a result, TINC submits that the Debtor cannot provide the adequate protection contemplated by 11 U.S.C. § 361, and TINC is therefore entitled to relief from the automatic stay for cause in accordance with 11 U.S.C. § 362(d)(1).

### B. The Debtor Lacks Equity in the Assets, and the Assets are not Necessary to an Effective Reorganization

34. Section 362(d) of the Bankruptcy Code provides that the Court shall grant relief from stay with respect to property of the estate if the Debtor has no equity in the property, and such property is not necessary to an effective reorganization. Pursuant to 11 U.S.C. § 362(g), in a hearing under subsection (d), the movant has the burden of proving lack of equity in the property at issue, and the party opposing the relief has the burden on all other issues.

35. Equity, of course, is "the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of unsecured creditors." Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1400 n.2 (9th Cir. 1984) (citation omitted). As of the Commencement Date, the Debtor owed TINC no less than $1,215,010.00 pursuant to the Townley Note. While the obligations under the Townley Note and the corresponding security interest granted under the Townley Security Agreement are first in priority, they are by no means the Debtor's only secured obligations. Upon information and belief, on the Commencement Date, the Debtor's total secured debt was more than $4.5 million, as it owed approximately $3,297,000.00 on its other secured obligations to First Bank, the Department of Development—State of Ohio, Ronald Bates, and Martin Wade. As of the Commencement Date, upon information and belief, the Debtor owned assets valued at approximately $2,200,000.00. Based on this information, the Debtor has no equity in its property, and secured creditors as a whole are substantially undersecured.

36. The burden now shifts to the Debtor to prove that TINC's collateral is necessary to an effective reorganization. As the Supreme Court has stated, the Debtor's burden requires "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*." United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 375-76 (1988) (emphasis in original). The Debtor will be unable to meet that burden.

37. In order to reorganize, it is necessary that the Debtor be able to operate within this chapter 11 case. The total value of the Debtor's assets is substantially less than its secured obligations, and the scope of those liens extends to every asset of the Debtor to the full amount of their value. Accordingly, to operate within this chapter 11 case, the Debtor will require both postpetition financing and authority to use cash collateral. There is no indication that the Debtor will be able to obtain postpetition financing sufficient to fund its operations, and TINC does not intend to consent to the use of its cash collateral in this case absent adequate protection. As set forth above, the Debtor is unable to provide TINC sufficient adequate protection. Because the Debtor (a) has no ability to generate operating funds to support its operations in this chapter 11 case free and clear of TINC's secured interest, (b) will be unable to adequately protect TINC for the use of its cash collateral, and (c) has no unencumbered assets by which to fund a confirmable chapter 11 plan for the benefit of anyone other than secured creditors, there is no prospect of the Debtor's effective reorganization. TINC is therefore entitled to the relief requested pursuant to 11 U.S.C. § 362(d)(2).

38. Importantly, Rose's disputes with Martin Wade have been raised and exhaustively briefed in the State Court Action, and the Article 9 sale of the Assets has been scheduled and fully marketed. After being denied one attempt to prevent that sale and filing a second motion to do so,

Rose commenced this involuntary case less than 48 hours before the auction was to take place. This shareholder dispute relies upon corporate law and the Uniform Commercial Code for its resolution and presents no unique bankruptcy or federal issues. Because the relief sought herein is in the best interest of the Debtor and its estate, the litigation tactic that is this involuntary case should not prevent TINC from obtaining the relief it is entitled to and proceeding with the public sale of the Assets in a genuine effort to save the Debtor in the industry and this city.

39. For the foregoing reasons, TINC requests relief from the automatic stay pursuant to 11 U.S.C. § 362(d) with respect to its collateral, to obtain possession of that collateral, and to proceed with the previously scheduled and fully marketed public sale of that collateral under Article 9 of the Ohio Uniform Commercial Code.

40. In order to preserve the value of the collateral and, more importantly, ensure that the Debtor can continue its business as a going concern, TINC requests that the Court waive the fourteen day stay provided in Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure so the sale may proceed as quickly as possible.

### IV. Abandonment

41. A bankruptcy court order terminating the automatic stay is not equivalent to an abandonment of the estate's property. Catalano v. Comm'r, 279 F.3d 682, 686-87 (9th Cir. 2002). It is clear, however, that pursuant to 11 U.S.C. § 362(c) the Court can terminate the stay with respect to both actions against the Debtor and property of the bankruptcy estate. In fact, "a stay-relief order normally allows the relieved creditor to realize its interest in the collateral, by, for example, pursuing a foreclosure action. If such a foreclosure sale results in proceeds in excess of the relieved creditor's interest, the surplus proceeds normally belong to the estate." Old West Annuity and Life Ins. Co. v. Apollo Group, 605 F.3d 856, 863 (11th Cir. 2010) (citation omitted).

To the extent that the Article 9 sale generates proceeds over and above TINC's debt, TINC will remit those proceeds to the bankruptcy estate for administration and distribution.

### V. Memorandum of Law

42. This Motion includes citations to applicable authorities and raises no novel issues of law. Accordingly, TINC respectfully requests that the Court waive the requirements contained in Local Bankruptcy Rule 9013-1(a) that a separate memorandum of law be submitted.

WHEREFORE, TINC respectfully requests entry of an Order (a) granting TINC relief from the automatic stay as to its collateral and all proceeds thereof pursuant to 11 U.S.C. §§ 362(d)(1) and (2); (b) permitting TINC to immediately take possession of its collateral; (c) permitting TINC to proceed with the sale of that collateral under Article 9 of the Ohio Uniform Commercial Code; (d) waiving the fourteen day stay provided by Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure; and (e) granting TINC all other proper relief.

Dated: June 8, 2011

Respectfully submitted,

/s/ Timothy J. Hurley
Timothy J. Hurley (0006458)
**TAFT STETTINIUS & HOLLISTER LLP**
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Phone: (513) 381-2838
Fax: (513) 381-0205
Email: hurley@taftlaw.com

*Attorneys for Creditor, TINC LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2011, a copy of the foregoing was served electronically on the following registered ECF participants through the Court's ECF system at the email addresses registered with the Court:

Reuel D. Ash
Attorney for Petitioning Creditors
rash@ulmer.com

Monica V. Kindt
Assistant U.S. Trustee
monica.kindt@usdoj.gov

and by regular U.S. mail, postage prepaid, upon the following:

The Rookwood Corporation
1920 Race Street
Cincinnati, OH 45202

First Bank
Attn: Greg Noll
9395 Kenwood Road, Suite 104
Cincinnati, OH 45242

First Bank
11901 Olive Blvd.
Creve Couer, MO 63141

Department of Development of the State of Ohio
Attn: Loan Servicing
Riffe Tower
77 South High Street, 28th Floor
Columbus, OH 43226

Ronald Bates
1859 Keys Crescent Lane
Cincinnati, OH 45206

Martin Wade
119 East Court Street
Cincinnati, OH 45202

/s/ Timothy J. Hurley

1459207v3