# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| THE ROOKWOOD CORPORATION | : | Case No. 11-12756 |
| | : | |
| Debtor. | : | Judge Jeffery P. Hopkins |

---

## DEBTOR'S OBJECTION TO
## MOTION OF TINC LLC FOR RELIEF FROM STAY

Now comes the Debtor, and hereby objects to the Motion of TINC LLC ("TINC") for Relief from Stay.

TINC's Motion for Relief from Stay is premature and must, as a matter of law, be denied (or held in abeyance) at this time. Contemporaneously with this Objection, the Debtor has filed a complaint (the "Complaint") seeking, among other things, equitable subordination of the purported security interest upon which TINC relies (the "Townley Note") in filing its Motion for Relief. As a matter of law, the claim for equitable subordination must be adjudicated before the Motion for Relief may be decided.

Rather than repeating verbatim herein all allegations of the Debtor's Complaint, that pleading is attached and incorporated by reference. In a nutshell, the Complaint alleges and illustrates how the Debtor's director/insider, Martin Wade, by and through movant TINC, engaged in breaches of fiduciary duty and other inequitable acts in acquiring the purported security interest upon which TINC now bases its demand for relief from stay.

As the attached Complaint demonstrates, there can be no reasonable doubt that Mr. Wade breached his fiduciary duty to the Debtor. The Debtor is a Delaware

corporation headquartered in Ohio. It has long been the law of Delaware that directors, such as Wade, owe fiduciary duties to the company and its shareholders. The Delaware Supreme Court synthesized long standing common law regarding duties a director owes his company and shareholders in *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Supr.1939). It concluded that "corporate . . . directors are not permitted to use their position of trust and confidence to further their private interests . . . [T]hey stand in a fiduciary relation to the corporation and its stockholders." *Id.*, at 510. Specifically, Delaware law:

> demands of a corporate director, peremptorily and inexorably, the **most scrupulous observance of his [fiduciary] duty** . . . to **refrain from doing anything that would** do injury to the corporation, or to **deprive it of profit or advantage . . .**

*Id* (emphasis added). This is particularly true when an officer or director is faced with a corporate opportunity.

> [I]f there is presented to a corporate . . . director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it. . . . then the law will not permit [the director] to seize the opportunity for himself.

*Id.*, at 511. And what are the consequences of a director seizing or usurping a corporate opportunity?

> . . . the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired.

*Id.*

Delaware law has not changed since the *Guth* decision over 70 years ago. The Delaware Supreme Court has upheld *Guth* time and time again, restating its premise,

holding that Delaware law prohibits a director or officer from "seizing a business opportunity if: (a) the corporation is financially able to undertake it; (b) it is within the corporation's line of business; and (c) the corporation is interested in the opportunity. *In re Century Glove, Inc.* 73 B.R. 528, 533 (Bankr. D. Del. 1987), *quoting Science Accessories v. Summagraphics*, 425 A. 2d 957, 963 (Del. Supr. 1980).

"In the line of business" is a phrase that Delaware courts have specifically noted

> is a phrase so elastic . . . it has a flexible meaning, which is to be applied reasonably and sensibly to the facts and circumstances of the particular case

*Guth, supra,* at 514. Thus, the "line of business" is clearly not limited to the corporation's specific line of business. In fact, in subsequent holdings, the Delaware courts have deemed any transaction in which the corporation has "an interest or expectancy" as meeting the definition of a corporate opportunity. *Yiannatisis v. Stephanis*, 653 A.2d 275, 278 (Del. Supr. 1995) (*citing Schreiber v. Bryan*, 396 A.2d 512, 519 (Del. Ch., 1978)).

Put another way, if it is a transaction which could impact the company, it certainly passes this broad test. For example, in *Yiannatisis, supra,* the Delaware Chancery Court held that two brothers of a three-family owned business diverted a corporate opportunity to purchase corporate stock to themselves, individually. In so finding, the Court noted that the brothers breached their fiduciary duties by even failing to present "the opportunity to purchase" the company stock. *Id.*, at 279.

Wade cannot claim that his breach is excused because Rookwood was financially incapable of purchasing the Townley Note. As the Complaint alleges, an investor named Sharri Rammelsberg was ready, willing, and able to loan the Debtor the $300,000

necessary to buy off the Townley Note. But even if Ms. Rammelsberg was unwilling to purchase the Townley Note, Mr. Wade's first breach – failing to present the offer to the company – prevents him from now claiming that the company's finances made it incapable of performance. The same situation took place in *Yiannatisis*. There the Court noted rightly that the failure to present the opportunity prevented the company from "explor[ing] adequately the possibility of purchasing the relevant stock" before the director improperly usurped that opportunity. *Yiannatisis, supra,* at 279. Put another way, Wade cannot claim that Rookwood could not have bought the Townley note when he never offered to Rookwood the deal he struck for himself.

Ohio law mirrors Delaware law on these points – it is improper for a director to usurp a corporate opportunity. Directors and officers of a corporation in Ohio historically have owed--and continue to owe--a duty to the corporation and its shareholders to refrain from profiting at the company's expense. *Taylor v. Miami Exporting Co.,* 5 Ohio 162, 166 (1831) ("those who act for the corporation and conduct its affairs, . . . cannot appropriate the corporation funds to their individual advantage, to gratify their passions or serve any other purposes than those for the general interest of the corporation"). Thus, as stated in *Thomas v. Matthews,* 94 Ohio St. 32, 43, 113 N.E. 669 (1916):

> It is the settled law of this state that directors must manage the corporate business with a view solely to the common interest, and cannot directly or indirectly derive personal profit or advantage from their position which is not shared by all the stockholders. . . . They occupy a strictly fiduciary relationship to the stockholders.

To that end, the court also stated in *Thomas*, a director cannot

> enter into any contract whatever as to his actions in his official capacity that will in any way restrict or limit the free exercise of his judgment and discretion, or place him

4

> under any direct and powerful inducement to disregard his
> duty to the corporation and the stockholders in the
> management of the corporate affairs. Such a contract is
> against public policy and void.

*94 Ohio St. at 60-61. See also Genesis Respiratory Serv. v. Hall, 99 Ohio App. 3d 23, 29,*

*649 N.E.2d 1266 (1994)* (holding director liable for misapplication of corporate funds

where he "had conflicting loyalties and, in light of those conflicting loyalties, the director

violated a fiduciary duty to the corporation"); *Prodan v. Hemeyer, 80 Ohio App. 3d 735,*

*610 N.E.2d 600 (1992)* (holding director cannot usurp corporate opportunity for his own

profit); *Wing Leasing, Inc. v. M & B Aviation, Inc., 44 Ohio App. 3d 178, 181, 542*

*N.E.2d 671 (1988)* ("principles which govern the fiduciary relationship between a

corporation and its directors include a duty of good faith, a duty of loyalty, a duty to

refrain from self-dealing and a duty of disclosure"); *Hubbard v. Pape, 2 Ohio App. 2d*

*326, 329-30, 203 N.E.2d 365 (1964)* (usurpation of corporate opportunity); *Michals Ent.,*

*Inc. v. Alexandrou,* 1984 WL 3617, at *2 (8th Dist., Cuyahoga Co., Nov. 21, 1984) ("the

undivided loyalty rule . . . prohibits a director or officer from placing himself in a

position of conflicting loyalties and subsequently violating his primary duty to the

corporation").

Here, TINC seeks relief from the automatic stay to proceed with a sale of the

Debtor's assets under Article 9 of the Uniform Commercial Code. TINC's right to sell

the Debtor's assets at an Article 9 sale is predicated upon its claim that it is a senior

secured creditor via the Townley Note. This status is fundamental to its right to conduct

a sale. *See generally, A Commercially Reasonable Sale Under Article 9: Commerical,*

*Reasonable, and Fair to All Involved* (Symposium), 28 Loy. L.A. L. Rev. 235 (1994)

However, because TINC's interest in the assets results from Mr. Wade's breach of his fiduciary duty, TINC is not, in fact, a senior secured creditor.

Thus, the Debtor respectfully submits that, after appropriate discovery and trial, a finding will be made to equitably subordinate the claim upon which TINC relies in filing its Motion for Relief. Indeed, because Mr. Wade was an insider in this instance, the prospects for the Debtor's success are enhanced:

> The extent and severity of the inequitable conduct required for equitable subordination depends on whether the movants were insiders of the debtor. 'Where the claimant is an insider or fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. Once the trustee meets this burden, the claimant must then prove the fairness of his transactions with the debtor or his claim will be subordinated (citations omitted).

*In re Mr. R's Prepared Foods, Inc.,* 251 B.R. 24, 29 (Bankr. D. Conn. 2000).

Under the circumstances presented, the Motion for Relief must be denied (or held in abeyance) pending adjudication by this Court of the Complaint.[1] The authorities on point establish this principle. For example, in *In re Mastro,* 2011 Bankr. LEXIS 2059, BAP No. WW-10-1142 (B.A.P. 9th Cir. 2011), the panel held that

> A bankruptcy court generally may not finally adjudicate the validity of a lien in either a relief from stay proceeding under § 362(d) or in a motion to sell under § 363(f). Both of those types of proceedings are contested matters, adjudicated by motion, *Rule 9014,* whereas lien validity determinations require an adversary proceeding. See *Rules 4001(a)(1), 6004(c), 7001(c).* However, when exercising its discretion to grant or deny relief under sections 362(d) or 363(f), a bankruptcy court should take into account an apparent issue that calls into question the validity of the creditor's interest. The prospective invalidity of that interest may justify denying relief from stay and/or granting the sale motion. (citations omitted.) In short, even though

---

[1] Equitable subordination is core proceeding and bankruptcy-specific claim that is not available outside the bankruptcy court.

the bankruptcy court may not finally determine the validity of the creditor's interest in estate property in these types of proceedings, the validity issue nonetheless can be relevant and should be considered before granting or denying relief.

*In re Mastro,* 2011 Bankr. LEXIS 2059, at **14-15 n.6.

Similarly, the Court in *In re Suddarth,* 222 B.R. 352, 353 (Bankr. N.D. Okla. 1998) held that a ruling on the validity of the underlying lien must be made before the motion to modify the stay could be resolved. As that Court stated,

> The validity of movant's lien is a critical issue in stay modification proceedings that involve collateral that is property of the estate. That Arcadia's lien on the Vehicle is not properly perfected and therefore not valid against the Trustee is the Trustee's defense to Arcadia's motion to Arcadia's motion to modify the automatic stay, and resolution of that issue is determinative as to whether stay modification is appropriate in this case. It would be premature to modify the stay to permit Arcadia to exercise its state law remedies against the Vehicle until a determination of the validity of Arcadia's lien is made. If the Trustee did not dispute perfection of Arcadia's lien in this proceeding, the stay would be modified and the Vehicle abandoned, and the Trustee would lose his only forum in which his *Section 544* lien avoidance action may be brought, relinquishing a potential recovery for the estate. (citations omitted).

*Suddarth,* 222 B.R. at 353.

The case before this Court is on all fours with the holdings in the *Mastro* and *Suddarth.* The issue of equitable subordination of the Townley Note must be determined before this Court can determine whether the Townley Note enables TINC to seek relief from the stay.

WHEREFORE, the Debtor respectfully requests that TINC's Motion for Relief be denied at this time (or held in abeyance) pending resolution of the equitable subordination claim set forth in the Complaint.

Respectfully submitted,

/s/ Reuel D. Ash
Reuel D. Ash (0055843)
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
(513) 698-5118
(513) 698-5119(fax)
rash@ulmer.com
*Proposed Counsel for Debtor*
*The Rookwood Corporation*

Earle J. Maiman (0014200)
5959 Cherokee Drive
Cincinnati, Ohio 45243
(513) 271-2989
earlemaiman@gmail.com
*Proposed Special Counsel for Debtor*
*The Rookwood Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Objection to TINC LLC's Motion for Relief From Stay has been served this 24th day of June, 2011 via CM/ECF Noticing on Timothy J. Hurley, Counsel for TINC LLC, hurley@taftlaw.com; Monica V. Kindt, Assistant U.S. Trustee, monica.kindt@usdoj.gov; and by ordinary U.S. mail upon First Bank, Attn: Greg Noll, 9395 Kenwood Road, Suite 104, Cincinnati, OH 45242; First Bank, 11901 Olive Blvd., Creve Couer, MO 63141; Department of Development of the State of Ohio, Attn: Loan Servicing, Riffe Tower, 77 South High Street, 28th Floor, Columbus, OH 43226; and Ronald Bates, 1859 Keys Crescent Lane, Cincinnati, OH 45206.

/s/ Reuel D. Ash

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

IN RE:                                              )          Case No.  11-12756
                                                    )
THE ROOKWOOD CORPORATION,                           )          Chapter 11
                                                    )
                        Debtor.                     )
                                                    )          Judge Jeffery P. Hopkins
_____                       )
                                                    )
THE ROOKWOOD CORPORATION                            )
1920 Race Street                                    )          Adv. Proc. No. 11-_____
Cincinnati, Ohio 45202                              )
                                                    )
                        Plaintiff,                  )
              v.                                    )
                                                    )
MARTIN WADE                                         )          **COMPLAINT**
8425 Bluecut Lane                                   )
Cincinnati, Ohio 45243                              )
                                                    )
and                                                 )
                                                    )
TINC, LLC                                           )
c/o Martin Wade                                     )
119 East Court Street                               )
Cincinnati, Ohio 45202                              )
                                                    )
and                                                 )
                                                    )
TINC, LLC                                           )
c/o Andrew G. Graf, Statutory Agent                 )
3500 Red Bank Road                                  )
Cincinnati, Ohio 45227                              )
                                                    )
                        Defendants.                 )

The Rookwood Corporation, the Debtor in the above-captioned case ("Rookwood" or

"Plaintiff"), for its Complaint against Martin Wade and TINC, LLC, states as follows:

# I.    PARTIES AND JURISDICTION

1.    This is an action for breach of fiduciary duty, breach of duty of loyalty, conversion, gross mismanagement, violation of other Delaware law relating to corporate governance, civil conspiracy, equitable subordination, and for recovery of preferences and fraudulent transfers.

2.    This Court has jurisdiction of this proceeding under 28 U.S.C. § 1334.  This proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and (K).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3.    Plaintiff Rookwood, the Debtor, is a Delaware Corporation, whose address is 1920 Race Street, Cincinnati, Ohio 45202.

4.    On information and belief, Defendant Martin Wade ("Wade") resides at 8425 Bluecut Lane, Cincinnati, Ohio 45243.

5.    On information and belief, Defendant TINC, LLC ("TINC") is an Ohio Limited Liability Company, whose address is 119 East Court Street, Cincinnati, Ohio 45202. Upon information and belief, Wade owns and/or controls TINC, LLC.

# II.    FACTUAL BACKGROUND

6.    Rookwood is a manufacturer of architectural tile, fine art pottery, corporate gifts and cremation urns. The original Rookwood Pottery Company was founded in 1880 and was one of the most influential, prestigious and innovative pottery companies in U.S. history. Rookwood did business until the mid 1900's, when it closed. Ultimately its molds and intellectual property were purchased by a Michigan collector, a Dr. Arthur Townley.

7.    In or about 2001, Patrick Rose ("Patrick") a Cincinnati entrepreneur, contacted Dr. Townley to inquire about the availability of certain Rookwood products. Their conversation

turned to the possibility of Townley selling the Rookwood assets, but went no further at that time.

8. Three years after his initial contact with Dr. Townley, Patrick received a call from Townley indicating that he was ready to sell.

9. Patrick asked his brother, Chris Rose ("Chris") if he would want to be involved in the Rookwood project. Chris is an artist in his own right. He is a graduate of the University of Arts in Philadelphia Pennsylvania. In his design career, he worked on brands such as 3M, Harley-Davison, Coca-Cola, General Electric and KFC. He has worked with world renowned artist Steve Tobin. Chris also participated in the design of the Korean War Memorial in Washington D.C.

10. Chris readily agreed to participate in his brother's effort to bring Rookwood back to life.

11. A third person, Raghu Rao ("Rao"), agreed to join the brothers in the Rookwood venture.

12. In 2004, Rookwood Corporation d/b/a The Rookwood Pottery Company was incorporated in Delaware. At that time, Patrick was President, Chris was Secretary and Mr. Rao was Chief Executive. All three were directors.

13. Among other things, the assets of Rookwood consisted of 3600 molds, historical pieces, shape books (i.e. journals of original artists), medals won by the company, trademarks, intellectual property, the corporate name and its logos. Dr. Townley agreed to sell all such Rookwood assets to the new Rookwood Corporation for $1.6 million. Dr. Townley took a zero-interest note (the "Townley Note") for this $1.6 million, with payments to be made over time.

14.     The process of bringing Rookwood back to life was extremely complicated. The company needed time and money to devote to research and development, creating scalable products, proprietary glaze compositions, molds and firing techniques. Finding and hiring personnel with the knowledge and skills sufficient to maintain the Rookwood reputation for quality was another challenge. Analyzing the market and determining the interests--sometimes competing--of various dealers and collectors as well as the retail market in general, was also extremely complex.

15.     As time passed, various investors purchased Rookwood shares.  However, Mr. Rao moved to China and sold his shares in a private transaction. Patrick moved to Poland and sold a million of his two million shares in another private transaction. Patrick stayed on as a director of the corporation. Mr. Rao was replaced on the board by a man named Michael Rafter. Chris remained as the third member of the board. With Rao and Patrick out of the country, Chris assumed operational responsibility as the President of the company.

16.     In late 2007 and early 2008, Wade purchased 4 million shares of Rookwood. This he did through an Ohio limited liability company he formed, ASTFH, LLC ("ASTFH"). As of that time, Wade (through ASTFH) and Chris were the two largest shareholders in Rookwood, each holding 4 million shares.

17.     In early 2008, Wade was elected to the Rookwood board. A shareholder named John Owens was elected to replace Patrick as the third Director. At that time, Wade acknowledged that Rookwood was unlikely to make money for another 5 years.

18.     Also in 2008, a building was found on Race Street in Cincinnati's Over-The-Rhine which would accommodate Rookwood's production and manufacturing needs. Wade personally purchased the building for $525,000.  Rookwood then obtained a loan from First

Bank for $1.7 million, which was personally guaranteed by Chris (in part) and Wade. Approximately $800,000 of the loan proceeds were spent on improvements to Wade's building. Rookwood entered into a triple net lease with an option to purchase the building.

19.     Just as Rookwood was getting to the point where it could launch a wide-scale sale of its products, the American economy tanked. The market for high-end pottery, tile and other Rookwood products dried up. Even though the Rookwood name was synonymous with quality for over a hundred years, this latest iteration of the company was essentially a start up. For a start up, the dire economic circumstances were a terrible development. Against this backdrop, Chris worked arduously to market Rookwood products and to keep the company as close to solvent as possible. To make matters worse, Chris' wife was diagnosed with cancer. Despite these pressing and difficult circumstances, Chris continued to attend to Rookwood's challenges.

20.     Ultimately, Chris was required to spend some time away from Rookwood to care for his wife. During Chris' time away, operations of the company were temporarily conducted by a consultant named Chip DeMois, who had originally been engaged to assist in fundraising.

21.     Mr. DeMois' work was ineffective and counterproductive. In June 2010, Chris terminated DeMois. Wade consented to the termination.

22.     Also in June 2010, John Owens resigned from the Rookwood board, leaving Chris and Wade as the only two board members.

23.     As of November, 2010, the Townley Note was in default. On November 19, 2010, Chris sent Wade an email reporting that Townley was threatening litigation over the past due note, but was going to defer any such action since the company was going to send Townley some earnest money. Chris further reported that he was going to meet with Townley to work through the problem. Townley then advised Chris that the problem would be worked through without

litigation and without the immediate need for earnest money. It was Chris' understanding that Townley would take considerably less than the approximately $1,150,000 due and owing on the note in exchange for a relatively modest pay off at that time. Chris understood that Rookwood might even be able to extinguish the Townley Note for $500,000 or less.

24. Unbeknownst to Chris and without notice to the shareholders, Wade secretly bought out the Townley Note for $300,000 on or about December 2, 2010. Wade did so through TINC, LLC. Thus, at a time when Rookwood had the opportunity to pay off the Townley Note for an amount far below its remaining face value and thereby relieve all of its assets of that encumbrance, Wade usurped that corporate opportunity and became Rookwood's creditor, alleging that the full $1,150,000 debt formerly owed on the Townley Note was payable to TINC and purportedly secured by all of Rookwood's assets.

25. Wade failed to offer the opportunity to Rookwood to purchase the Townley Note for $300,000. In fact, at the time Wade secretly bought the Townley Note, a Rookwood investor named Sharri Rammelsberg would have loaned the money to Rookwood to pay off the Townley Note.

26. On December 22, 2010, Chris and Wade were to meet at the offices of corporate counsel to prepare for a shareholders meeting scheduled to occur in early January. At that meeting, Wade produced a purported "written consent" signed by himself and his wife Marilyn on behalf of ASTFH, along with certain other persons. Some of those persons were, and some were not, shareholders in Rookwood. Although it was not signed by 50% of Rookwood's shareholders, that "written consent" purported to remove Chris as a director of the company. Wade then announced that he was unilaterally removing Chris as President of the company, and caused all the locks at Rookwood to be changed.

27.     On the same day that Wade was purportedly removing Chris from his position as director and President and was locking Chris out of the premises at Rookwood, Wade appointed Chip DeMois as CEO of Rookwood. This was the same Chip DeMois who had been so ineffective in running the company when Chris was on leave attending to his sick wife. A prepared statement was then issued by DeMois stating:

> "Chris was the catalyst that returned Rookwood to production and brought that artistic excellence to Over-The-Rhine. His tireless effort and his passion for Rookwood's history and potential is evident and very much appreciated. I am confident that our team of skilled artisans will further cultivate Rookwood Pottery's reputation for design and craftsmanship."

28.     On January 7, 2011, DeMois announced that Rookwood's business had been transferred to a new entity owned 100% by Wade and his wife Marilyn. In a prepared statement asserting that the Wades had taken control of the corporate assets, DeMois stated:

> "They (the Wades) acted upon their ability to assert control of the assets. It's basically a matter of moving from one entity that was financially ailing to another entity that is well funded and moving forward."

29.     On information and belief, Wade has, in fact, caused Rookwood to conduct part if not all of its financial affairs through a TINC bank account, controlled by Wade, rather than through Rookwood's own bank accounts.

30.     In addition to the Townley Note loan documents, Wade alleges that he has a security interest in Rookwood personal property through a Revolving Credit Promissory Note dated March 30, 2011, in the maximum amount of $1,500,000, and a Security Agreement of even date between Rookwood and Wade. Wade additionally alleges that such security interest is perfected by the filing of a UCC-1 financing statement filed on or about April 1, 2011.

31.     The alleged filing of the April 1, 2011 financing statement by Wade constitutes a transfer of an interest of Rookwood's property.

7

32.     The alleged filing of the April 1, 2011 financing statement was done to or for Wade's benefit, on account of an antecedent debt owed by Rookwood to Wade before the transfer was made.

33.     The alleged filing of the April 1, 2011 financing statement was done while Rookwood was insolvent.

34.     At all times relevant hereto, Wade was and is an insider of Rookwood pursuant to Section 101(31) of the Bankruptcy Code.

35.     The alleged filing of the April 1, 2011 financing statement was made within one year before the date of the filing of the petition.

36.     The alleged filing of the April 1, 2011 financing statement enabled Wade to receive more than he would have if the case were a case under Chapter 7 of Title 11, or if the filing had not been done.

37.     At the close of business on Friday, April 15, 2011, Wade caused TINC to disclose that it intended to proceed with an Article 9 sale of all Rookwood assets on April 27, 2011.

38.     TINC has claimed a right to sell Rookwood's assets at an Article 9 sale based upon a claim that it is Rookwood's senior secured creditor. However, TINC's interest in the Rookwood assets results from Wade's breach of his fiduciary duty and usurpation of corporate opportunity, and TINC is not, in fact, a senior secured creditor.

39.     Despite the fact that TINC is not a senior secured creditor, Wade intended to credit bid at the Article 9 sale the entire $1,150,000 that Rookwood owed on the Townley Note prior to Wade's unlawful purchase of the Townley Note for $300,000.

40.     Wade also reserved to himself, through TINC, the discretion to reject any bid at the Article 9 sale that he deemed contrary to the best interests of Rookwood. As such, he positioned himself to declare his own bid as the winning bid irrespective of competing bids.

41.     Bid procedures imposed by Wade for the Article 9 sale were released on April 15, 2011. Bids were to submitted only 10 days later, on April 25, 2011. This unreasonable time frame did not allow interested bidders to conduct reasonable due diligence and further assured that Wade would be the successful bidder.

42.     Wade's bid procedures also demanded that prospective bidders submit a preliminary bid prior to attending an "outcry auction." This positioned Wade to review any competing bids that might be filed and adjust his own conduct accordingly in the bidding process.

43.     Despite requests that the Article 9 sale, if any, be conducted by a neutral third party, Wade refused.

44.     The petitioning creditors had no choice other than to file an involuntary bankruptcy case for Rookwood in order to protect Rookwood and its legitimate creditors from Wade's plan to unilaterally seize all of Rookwood's assets at the expense of other creditors and shareholders.

45.     Effective June 20, 2011, a majority of Rookwood's shareholders, in lieu of holding a special meeting, authorized a resolution removing Wade and two other directors from the board of directors. That same resolution elected Chris to the office of director of Rookwood.

46.     In furtherance of his efforts to unilaterally seize all of Rookwood's assets at the expense of other creditors and shareholders, Wade has failed and refused to comply with the action taken by the Rookwood shareholders.

## COUNT I – Equitable Subordination

47.     Rookwood incorporates the above allegations as if fully rewritten herein.

48.     The inequitable conduct described above by insider Wade, individually and by and through TINC, resulted in injury to Rookwood's creditors and conferred an unfair advantage upon Wade.

49.     Equitable subordination of the secured claims of Wade and/or TINC is not inconsistent with the provisions of the Bankruptcy Code.

50.     Rookwood is entitled to equitably subordinate Wade and/or TINC's secured claims under applicable common law and Section 510 of the Bankruptcy Code.

## COUNT II – Avoidance and Recovery of Preferential Transfers

51.     Rookwood incorporates the above allegations as if fully rewritten herein.

52.     The receipt by Wade of the transfer described herein constitutes a preference received by Wade, which Rookwood is entitled to avoid pursuant to Sections 547 and 550 of the Bankruptcy Code.  To the extent Wade has caused Rookwood to make any payments to him, TINC, or any other entity within Wade's control, arising from any alleged loans to Rookwood, such payments are also avoidable and recoverable hereunder.

## COUNT III – Breach of Fiduciary Duty

53.     Rookwood incorporates the above allegations as if fully rewritten herein.

54.     Defendants' misconduct, as described above, constitutes breaches of fiduciary duties owed to Rookwood and its shareholders.  Those breaches have actually and proximately caused Rookwood monetary damage in an amount to be determined at trial.  Further, those breaches have caused Rookwood, certain distinct, irreparable harm which entitles Rookwood to equitable relief as described below.

## COUNT IV – Breach of Duty of Loyalty

55.     Rookwood incorporates the above allegations as if fully rewritten herein.

56.     Defendants' misconduct, as described above, constitutes breaches of the duty of loyalty owed to Rookwood and its shareholders.  Those breaches have actually and proximately caused Rookwood  monetary damage in an amount to be determined at trial.  Further, those breaches have caused Rookwood irreparable harm which entitles Rookwood to equitable relief as described below.

## COUNT V – Conversion

57.     Rookwood incorporates the above allegations as if fully rewritten herein.

58.     Defendants' misconduct, as described above, constitutes conversion.    That misconduct has actually and proximately caused Rookwood monetary damage in an amount to be determined at trial.  Further, that misconduct has caused Chris and Rookwood certain distinct, irreparable harm which entitles Rookwood to equitable relief as described below.

## COUNT VI – Accounting

59.     Rookwood incorporates the above allegations as if fully rewritten herein.

60.     Rookwood demands a complete accounting of Rookwood's financial and corporate records and data, including but not limited to all:  shareholder ledgers and other evidence of ownership, minute books, resolutions, shareholder consents, director consents, transactions between the parties to this litigation (and any other entities one or more of the Defendants own or control), communications from creditors, promissory notes and other loans/debt related documents, employment agreements, account ledgers, profit/loss statements, balance sheets, income documentation, and all other financial records of Rookwood.

## COUNT VII – Gross Mismanagement

61.    Rookwood incorporates the above allegations as if fully rewritten herein.

62.    Defendants, through their above-described conduct, have grossly mismanaged Rookwood. That mismanagement has actually and proximately Rookwood monetary damage in an amount to be determined at trial. Further, that negligence has caused Rookwood certain distinct, irreparable harm which entitles Rookwood to equitable relief as described below.

## COUNT VIII – Civil Conspiracy

63.    Rookwood incorporates the above allegations as if fully rewritten herein.

64.    Defendants agreed to commit the above unlawful and improper acts in concert with each other in furtherance of a common scheme, resulting in multiple civil conspiracies.

65.    Defendants' common unlawful conspiracies have actually and proximately caused Rookwood monetary damage in an amount to be determined at trial. Further, those violations have caused Rookwood certain distinct, irreparable harm which entitles Rookwood to equitable relief as described below.

**WHEREFORE**, Plaintiff, the Debtor Rookwood Corporation, demands that judgment be entered in its favor against Defendants, jointly and severally, by:

1.    Awarding equitable relief, including but not limited to the equitable subordination of TINC's and/or Wade's secured claims;

2.    Avoidance and recovery of preferential transfers, including but not limited to avoidance of Wade's allegedly perfected security interest in Rookwood assets;

3.    Awarding compensatory damages in an amount to be determined by the Court, plus pre-and post-judgment interest, costs, expenses, and attorneys' fees;

4.    Awarding punitive damages, and

5.    Awarding any and all other relief, in law or in equity, to which Rookwood is entitled.

Respectfully submitted,

/s/ Reuel D. Ash
Reuel D. Ash (0055843)
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
(513) 698-5118
(513) 698-5119(fax)
rash@ulmer.com
*Proposed Counsel for Debtor*
*The Rookwood Corporation*

Earle J. Maiman (0014200)
5959 Cherokee Drive
Cincinnati, Ohio 45243
(513) 271-2989
earlemaiman@gmail.com
*Proposed Special Counsel for Debtor*
*The Rookwood Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Complaint has been served this 24th day of June, 2011 via CM/ECF Noticing on this 24th day of June, 2011 via CM/ECF Noticing on Timothy J. Hurley, Counsel for TINC LLC, hurley@taftlaw.com; Monica V. Kindt, Assistant U.S. Trustee, monica.kindt@usdoj.gov;, and by ordinary U.S. mail upon the following Martin Wade, 8425 Bluecut Lane, Cincinnati, Ohio 45243; TINC, LLC, c/o Martin Wade, 119 East Court Street, Cincinnati, Ohio 45202, and TINC, LLC, c/o Andrew G. Graf, Statutory Agent, 3500 Red Bank Road, Cincinnati, Ohio 45227

/s/ Reuel D. Ash